# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

ANTONIO GARCIA-DORANTES,

      *Petitioner*,               CASE NO. 05-CV-10172

*v.*                          DISTRICT JUDGE DAVID M. LAWSON
                                MAGISTRATE JUDGE CHARLES E. BINDER

MILLICENT WARREN,

      *Respondent*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
## AFTER EVIDENTIARY HEARING

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Petitioner Garcia-Dorantes'

habeas claim that he was denied his Sixth Amendment right to a fair and impartial jury drawn from

a fair cross section of the community be allowed to proceed because Petitioner Garcia-Dorantes

has established a *prima facie* case which has not been rebutted by Respondent.


## II.    REPORT

### A.    Background & Procedural History

Petitioner Antonio Garcia-Dorantes ("Garcia-Dorantes") is a Michigan state prisoner who,

at the time of the filing of this petition, was confined at the Thumb Correctional Facility in Lapeer,

Michigan. Garcia-Dorantes was convicted of second-degree murder and assault with the intent to

do great bodily harm less than murder on September 10, 2001, in Kent County, Michigan. (Doc.

1 at 1-2.)

This habeas corpus case brought pursuant to 28 U.S.C. § 2254 was referred to the undersigned magistrate judge for purposes of holding an evidentiary hearing and issuing a Report and Recommendation ("R&R") regarding the remaining claim of whether Petitioner's "Sixth Amendment right to a jury drawn from a fair cross section of the community was violated." (Doc. 36 at 31.) In the reference order, the district judge noted that since the undersigned magistrate judge "has conducted hearings on other cases arising from prosecutions during the period when jury panels were selected using the defective system that resulted in the exclusion of population segments in Kent County that contained the highest concentration of minority citizens[,]" the undersigned magistrate judge "may incorporate the evidence from those hearings, with the consent of the parties." (*Id.*)

At the evidentiary hearing held in this case on August 25, 2011, the parties stipulated to the admission of the following evidence, all of which was initially introduced during the joint evidentiary hearing held in the cases of *Parks v. Warren*, No. 05-10036 (E.D. Mich.), and *Ambrose v. Booker*, No. 06-13361 (E.D. Mich.): (1) transcript of hearing; (2) transcript of deposition of Terry Holtrop; (3) report of Paul L. Stephenson, Grand Valley State University, prepared for *People v. Bryant*, Kent County Circuit Court Number 01-08625; and (4) report of Dr. Edward Rothman, University of Michigan. (Doc. 47 at 6-7.)

After the August 2011 evidentiary hearing, supplemental briefs were filed by both parties; thus, the matter is ready for Report and Recommendation.

### B.    Governing Law

In order to establish a *prima facie* violation of the Sixth Amendment's right to a jury representing a fair cross section of the community, a petitioner must show: "(1) that the group

alleged to be excluded is a 'distinctive' group in the community [cognizable prong]; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community [underrepresentation prong]; and (3) that underrepresentation is due to systematic exclusion of the group in the jury-selection process [systematic exclusion prong]." *United States v. Ovalle*, 136 F.3d 1092, 1098 n.7 (6th Cir. 1998) (citing *Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979)). Exclusion need not be intentional to be unconstitutional under the Sixth Amendment's fair-cross-section guarantee, but the exclusion must be systematic. *Duren*, 439 U.S. at 368 n.26. Systematic means "inherent in the particular jury-selection process utilized." *Id.* at 366.

If a *prima facie* violation is established, the government is required to show that "a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group" in order to rebut the presumption. *Id*. at 367-68.

## C.    Evidence from *Parks* and *Ambrose*

On October 26, 2009, an evidentiary hearing was held in the *Parks* and *Ambrose* cases and the transcript has been admitted in the instant case (Doc. 46 at Ex. 1) by stipulation of the parties. (Doc. 47 at 6.) At the 2009 hearing, Wayne Bentley, a teacher in Grand Rapids Public Schools, testified that he has been a member of the Kent County Jury Commission since 1998. (Doc. 46, Ex. 1 at 14.) This unique board of three oversees the Kent County jury processes. (*Id.*) Mr. Bentley testified that he regularly took his government class to the Kent County Circuit Court to "go into the jury assembly room and count the minorities." (*Id.* at 15.)

3

Terry Holtrop, case management manager for the Kent County Circuit Court since March 2001, testified in a deposition[1] that shortly after he became employed with the court, jury commissioner Wayne Bentley  became vocal about the lack of minorities in the jury pools. (Doc. 46, Ex. 2 at 6, 9.) Concern about the racial composition of the venire "came to a head" in September 2001 after Mr. Bentley's high school class created a report on the issue as part of a class project. (*Id.* at 9-10.) Mr. Holtrop indicated that sometime after November 2001, the county implemented Commissioner Bentley's suggestion that when a jury questionnaire is returned from a particular zip code, another questionnaire be sent to someone from that same zip code to help increase minority representation. (*Id.* at 12-13.) Mr. Holtrop stated that since the 2002 computer system change to correct the zip code bias, he does not believe that there have been any problems with underrepresentation. (*Id*. at 13-14.)

The Kent County Jury Management System Report (hereafter "the Report"), which is dated August 1, 2002 (Doc. 46, Ex. 2 at 134),[2] describes the genesis of the computer error described by Mr. Bentley during his hearing testimony. The Report first indicates that the random number generator used in the County's jury management system functioned properly and was not the source of any problems. (*Id.* at 138.) The Report indicates that in April 2001, the job of updating and loading the state files of eligible jurors was taken over by the county as part of a cost-cutting effort. (*Id.* at 137.) The Report explains:

> [I]n the initial set-up of the Oracle database to accommodate the driver's license and State ID data from the State file, an error was made in one parameter. Whether this

---

[1]This deposition was taken for presentation in the Eastern District of Michigan case of *Powell v. Howes*, Case No. 05-71345.

[2]The Report was an exhibit included with Terry Holtrop's deposition and his deposition was received in ths instant case pursuant to the parties' stipulation. (Doc. 47 at 6.)

was a programming error, the carry-over of a setting that existed within the Sybase database, misinterpreting instructions, or simply human error, that is now almost impossible to determine. The parameter that was entered within the database was 118,169. What should have been inserted within this setting was the total number of records in the State File, or 453,981 in 2001.

The net effect of this incorrect parameter is that the Jury Management System performed a random selection against the first 118,169 jurors on the file. The percentage of jurors selected per Zip Code was proportional to the Zip Code composition of the first 118,169 records – but not Kent County as a whole. The total pool of prospective jurors from the State File is of course 3.8 times larger than the 118,169 and hence the type of jury pull data as is evidenced in the various tables included in this report, for the second half of 2001 and the first half of 2002.

The next logical question being, why then did the jury pull from Zip Code 49341 jump so dramatically for 2001, from an average of 3.8% up to 10.24% . . . and why did the jury pulls from Zip Code 49507 decline from an average of 8.56% to 2.13%?

The answer being that in 1998 (as was mentioned previously) the State File did not come in random order, but rather in Zip Code order . . . lowest numbers to highest numbers. In subsequent years, new prospective jurors (either based on age or having moved to the County) were added to the end of the database. Existing prospective jurors (those that were on file the previous year) would simply have address information updated based on what the State provided. Their position in the dataset would not change. Therefore, the first 118,169 records of the dataset have a high percentage of lower numbered zip codes. As indicated on the map included in his packet, all the Zip Codes with the lower numbers are located outside of the Grand Rapids metro area.

(*Id.* at 137-38.) The Report indicated that the error occurred from April 2001 through July 2002 and that the error had been corrected as of the date of the Report, i.e., August 1, 2002. (*Id.* at 138.) I note that Garcia-Dorantes' trial began on August 27, 2001. (Doc. 21.) Therefore, Garcia-Dorantes was affected by the computer error discussed above.

A report prepared by Paul L. Stephenson, III, Ph.D., was also submitted. (Doc. 46. Ex. 2 at 52.) Dr. Stephenson's report was prepared for Judge Dennis Kolenda of the Kent County Circuit Court and it analyzed the Kent County jury pool for the trial *People v. Bryant*, which was held in

January 2002. (*Id.*) Dr. Stephenson concluded that the absolute disparity test[3] "result indicates that there is a 6.03 percent difference between the percentage of eligible Black and African Americans in Kent County and the actual percentage in the venire." (*Id.* at 54.) Dr. Stephenson further concluded that the comparative disparity test[4] showed that the *Bryant* trial "had 73.1% fewer Black or African American members than could have been expected in Kent County." (*Id.*) Dr. Stephenson suggests that neither the absolute nor comparative disparity tests are "viable for inferential purposes" because they are "not capable of identifying whether this group is statistically significantly underrepresented and small changes in the venire representation will unduly distort the analysis . . . ." (*Id.*)

Using the standard deviation[5] and binomial tests, Dr. Stephenson concluded that there was "insufficient evidence to demonstrate that the representation of Blacks or African Americans <u>in the venire</u> is biased, this is in part due to the size of the venire." (*Id.* at 55 (emphasis in original).) After employing the Chi-square Goodness-of-fit test, Dr. Stephenson found that "there is essentially no chance of acquiring the results we obtained if the selection process for potential jurors is unbiased. As a result, there is overwhelming evidence to conclude that the selection process <u>for terms</u> during the first months of 2002 was biased." (*Id.* at 56 (emphasis in original).) Dr. Stephenson's summary stated that a "systematic bias did exist in the selection of individuals

---

[3]The Supreme Court has explained that the "'[a]bsolute disparity' is determined by subtracting the percentage of African-Americans in the jury pool . . . from the percentage of African-Americans in the local, jury-eligible population[.]" *Berghuis v. Smith*, ___ U.S. ___, 130 S. Ct. 1382, 1390, 176 L. Ed. 2d 249 (2010).

[4]The Court in *Smith* also stated that "'comparative disparity' is determined by dividing the absolute disparity . . . by the group's representation in the jury-eligible population[.]" *Smith*, 130 S. Ct. at 1390.

[5]According to the Supreme Court, "[s]tandard deviation analysis seeks to determine the probability that the disparity between a group's jury-eligible population and the group's percentage in the qualified jury pool is attributable to random chance." *Smith*, 130 S. Ct. at 1390 n.1.

summoned for jury duty during the first three months of 2002. This bias would have inevitably led to underrepresentation of Black or African Americans in the terms during this period of time." (*Id.* at 58.)

The parties also submitted a report by Edward Rothman, Ph.D., who performed an analysis of the Kent County jury pool between January 1998 and December 2002. (Doc. 46 at Ex. 4.) Dr. Rothman's analysis concluded that the period between April 2001 and August 2002 revealed significantly more underrepresentation of African Americans than the earlier period studied. (*Id.* at 7, 9.) Dr. Rothman found that the absolute disparity between jury-eligible African Americans and those who appeared on jury venires was 3.45% between April 2001 and August 2002. (*Id.* at 1-2.) Dr. Rothman further concluded that the comparative disparity during this time period was 42%. (*Id.* at 2.) Dr. Rothman also considered and concluded that the absolute disparity between jury-eligible African Americans or Hispanics and those who appeared on jury venires between April 2001 and August 2002 was 4% and the comparative disparity was 29%. (*Id.*)

### D.    Evidentiary Hearing in This Case

At the hearing held on September 13, 2011, when asked about the racial make-up of the jury pool from which his petit jury was drawn, Garcia-Dorantes testified, "I don't remember very well – but the majority of them were of white race." (Doc. 47 at 10.) When asked if he remembered any Black or African-American people, Garcia-Dorantes responded, "I don't remember." (*Id.*) As to Spanish-speaking people, Garcia-Dorantes stated, "I don't know if that person spoke Spanish, but he did understand some." (*Id.* at 11.)

Gail Van Timmerman, Jury Clerk Coordinator at the time of Garcia-Dorantes' trial, testified that from September 2001 through the time when the zip code bias was resolved, she was

"manipulating the panel in order to add ethnicity into the panel, especially if it was black, yes."

(Doc. 47 at 26-27.) She stated that she did not manipulate any jury venires at the time of Garcia-

Dorantes' trial, which began on August 27, 2001, because the manipulation "never happened in

the old courthouse" and the move to the new courthouse occurred sometime in September 2001.

(*Id.* at 36.) Van Timmerman explained what she means by manipulating the panel: she "would call

the . . . panel, and then [she] would see that there were no blacks – and then [she] would remove

some of those jurors and replace them visually with jurors that were black." (*Id.* at 29-30.) Van

Timmerman added that she only manipulated the venires once or twice and that "I do believe the

judges were aware of what I was doing, because I thought it was the right thing to do. We

absolutely had no one to go into voir dire if you had a black defendant, you know. There were no

black jurors." (*Id.* at 28.) She further testified, "I don't believe we ever did it for Hispanic persons,

and the reason is, is because I . . . thought our percentages or our numbers for Hispanics were

much higher than for African Americans. In other words, I could visually see three or four

Hispanics in a Monday pool . . . [whereas] you would often not see any black people at all." (*Id.*

at 29.)

      **E.**      **Analysis & Conclusions**

      **1.**      **Procedural Default**

Respondent contends that Garcia-Dorantes has "procedurally defaulted his fair cross section

claim in the state court by failing to object to the jury venire before the jury was impaneled and

sworn. He has not shown cause and prejudice so as to excuse the default or that a fundamental

miscarriage of justice would result by this Court's failure to consider his claim." (Doc. 48 at 12.)

      **a.**      **Applicable Standards**

8

The AEDPA provides that federal courts "cannot grant a writ of habeas corpus to a prisoner held in state custody unless '(A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.'" *D'Ambrosio v. Bagley*, 527 F.3d 489, 495 (6th Cir. 2008) (quoting 28 U.S.C. § 2254(b)(1)). The "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3).

Federal courts lack jurisdiction to consider claims in a habeas petition that were not "fairly presented" to the state courts. *Franklin v. Rose*, 811 F.2d 322, 324-25 (6th Cir. 1987). To "fairly present" a federal claim in the state court, a petitioner must plead both factual and legal bases for the claim. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). Meeting this standard does not require recitation of "chapter and verse" of constitutional law, but rather requires only "adequately appris[ing] the state courts of the constitutional theory to be relied upon at appellate review." *Franklin*, 811 F. 2d at 326; *see also Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (petitioners need not "cite book and verse on the federal constitution" to satisfy the exhaustion requirement).

The Sixth Circuit has explained that

[w]hen a habeas petitioner fails to obtain consideration of a claim by a state court, either due to the petitioner's failure to raise that claim before the state courts while state-court remedies are still available or due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim, that claim is procedurally defaulted and may not be considered by the federal court on habeas review.

*Seymour v. Walker*, 224 F.3d 542, 549 (6th Cir. 2000) (quoted with approval in *Broom*, 441 F.3d at 401). In addition, procedural default occurs where a petitioner fails to comply with a state procedural rule that required him to have done something at trial to preserve an issue, e.g., make a contemporaneous objection or file a motion for directed verdict. *United States v. Frady*, 456 U.S. 152, 167-69, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982).

"In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991). The Sixth Circuit has set forth a four-part test for determining whether a prisoner's claim is procedurally defaulted and therefore barred from habeas review. *Cooey v. Coyle*, 289 F.3d 882, 897 (6th Cir. 2002); *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986).

The first step of the procedural default analysis is to determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule. *Maupin*, 785 F.2d at 138. Second, the court must determine whether the procedural sanction was actually enforced by the state courts – that is, whether the state courts actually based their decision on the procedural rule. *Id*. "In determining whether state courts have relied on a procedural rule to bar review of a claim, we look to the last reasoned opinion of the state courts . . . ." *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003). *See also Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 805, 111 S. Ct. 2590,

115 L. Ed. 2d 706 (1991) (to determine "[w]hether a state court rested its holding on procedural default so as to bar federal habeas relief . . ., we look to the 'last *explained* state-court judgment'").

Third, the federal court must consider whether the procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. *Maupin*, 785 F.2d at 138. The fourth prong provides that, if the above three factors are met, the Court may still excuse the default and address the merits of the claim if the petitioner can demonstrate that there was cause for him to not follow the state's procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.* Cause exists if there is an "objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 752. It is Petitioner's burden to demonstrate both cause and prejudice. *Simpson*, 238 F.3d at 408.

    **b.**    **Application and Analysis**

Turning to the first three steps of the procedural default analysis, Michigan has a contemporaneous objection rule which provides that a party's failure to object at trial leads to the claim being waived and reviewed solely for plain error. *See People v. Eccles*, 260 Mich. Ct. App. 379, 385 (2004) (applying rule to alleged Sixth Amendment fair cross section and Fourteenth Amendment *Batson* errors). In the instant case, the Michigan Court of Appeals applied the procedural rule and enforced its sanction against Petitioner's Sixth Amendment fair-cross-section claim. *People v. Garcia-Dorantes*, No. 239306, 2003 WL 22416511, at *2 (Mich. Ct. App. Oct. 23, 2003).[6] "Michigan's contemporaneous-objection rule is both a well-established and normally

---

[6]The Michigan Supreme Court denied review. *People v. Garcia-Dorantes*, 477 Mich. 1005, 726 N.W.2d 41 (2007).

2:05-cv-10172-DML-CEB   Doc # 50   Filed 01/05/12   Pg 12 of 24   Pg ID 1276

enforced procedural rule" that "constitutes an adequate and independent state ground for foreclosing federal review." *Taylor v. McKee*, 649 F.3d 446, 451 (6th Cir. 2011).

The sole remaining question, then, involves the fourth step; namely, whether Petitioner has demonstrated "cause" justifying neglect of the procedural rule and "prejudice" actually resulting from the alleged constitutional error. *Greer*, 264 F.3d at 673.[7]

As to cause, Garcia-Dorantes testified that although he doesn't "remember very well," he thinks that "the majority of [of the people on the jury panel] were of white race." (Doc. 47 at 10.) When asked if he remembered any Black or African-American people, Garcia-Dorantes responded, "I don't remember." (*Id.*) As to Spanish-speaking people, Garcia-Dorantes stated, "I don't know if that person spoke Spanish, but he did understand some." (*Id.* at 11.) Ms. Van Timmerman testified that "you would often not see any black people at all." (Doc. 47 at 29-30.) In addition, the parties submitted testimonial evidence from Mr. Holtrop that soon after March 2001, jury commissioner Wayne Bentley became vocal about the lack of minorities in the jury pools (Doc. 46, Ex. 2 at 6, 9) and concern about the racial composition of the venire "came to a head" in September 2001 after Mr. Bentley's high school class created a report on the issue as part of a class project. (*Id.* at 9-10.) Garcia-Dorantes' trial began between those two dates, on August 27, 2001. (Doc. 21.)

Therefore, the evidence shows that the racial composition issue was known and steps (albeit less than effective ones) were being taken to alleviate the problem at the time of Garcia-Dorantes' trial. However, the Report that identified and described the computer error and thus led to its

---

[7]As noted by Judge Lawson, the miscarriage of justice exception does not apply here since it applies only to cases where factual innocence has been supported with new and reliable exculpatory evidence and Garcia-Dorantes has not presented any such evidence. (Doc. 36 at 11-12.)

correction was not published until August 1, 2002, almost one year after Garcia-Dorantes' trial began. (Doc. 46, Ex. 2 at 134).[8]

Both counsel are correct in noting that the district courts have reached inconsistent results as to whether petitioners can establish cause under like circumstances. Courts that have found cause existed have focused on the fact that no one, including all the Kent County officials responsible for the jury panel composition, was aware of the computer "glitch" at the time of trial and that since a discrepancy in a single jury panel is insufficient to show underrepresentation under *Duren,* the composition of a petitioner's jury panel alone should not be expected to have spurred an objection. *See Ambrose v. Booker*, 781 F. Supp. 2d 532, 541-43 (E.D. Mich 2011) (also finding prejudice because systematic underrepresentation is a structural error for which prejudice is presumed); *Parks v. Warren*, 574 F. Supp. 2d 737, 744 (E.D. Mich. 2008).

On the other hand, the district courts that have found that a petitioner could not establish cause have relied on the Michigan law providing that a criminal defendant is on notice once he has viewed the jury panel and that constitutional claims must be preserved by objection at the trial court level, even where the petitioner had no reason to know of the underlying cause of the problem, i.e., the computer "glitch." *See Wilbon v. Romanowski*, No. 07-12780, 2010 WL 3702580, at *13 (E.D. Mich. Aug. 20, 2010); *Carter v. Lafler*, No. 1:09-cv-215, 2010 WL 160814, at *3 (W.D. Mich. Jan. 8, 2010); *Welborn v. Berghuis*, No. 1:05-cv-346, 2009 WL 891708, at *3-4 (W.D. Mich. Mar. 31, 2009); *Burros v. Curtin*, No. 05-701, 2009 WL 736066, at *6-9 (W.D. Mich. Mar. 18, 2009). Many of the cases which found no cause distinguished *Amadeo v. Zant*, 486 U.S. 214, 108 S. Ct. 1771, 100 L. Ed. 2d 249 (1988), on the basis that, in *Amadeo*, county officials had

---

[8]In addition, as noted by Judge Lawson, a newspaper article describing the computer glitch appeared in the Grand Rapids Press on July 30, 2002, which was around the same time as the Report. (Doc. 36 at 13.)

concealed the memorandum intentionally designed to result in underrepresentation of blacks and women in the master jury wheel, whereas in this case it has not been alleged that Kent County engaged in any intentional conduct designed to cause or conceal the underrepresentation. *See Wellborn*, 2009 WL 891708 at *4; *Burros*, 2009 WL 736066, at *6.

Although reasoned analysis supports both sides of this question, I suggest that cause exists in the instant case. The testimony of both Garcia-Dorantes and the jury clerk, Ms. Van Timmerman, establish that even if there were no visibly-apparent African-American jurors on the venire panel, there usually were visibly-apparent Hispanics and that there was at least one Hispanic on Garcia-Dorantes' venire panel. (Doc. 47 at 10; 29-30.) The existence of some minority representation may have obscured counsel's potential discovery of the underrepresentation of African-American jurors. In addition, although the evidence revealed that there was concern about the potential underrepresentation problem at the time Garcia-Dorantes' trial began, the issue did not "come to a head" until after his trial began, perhaps even after his trial concluded. (Doc. 46, Ex. 2 at 6, 9-10.) It is clear that the Report describing the problem was not published until long after Garcia-Dorantes' trial concluded. (Doc. 46, Ex. 2 at 134.) I therefore suggest that, under these circumstances, it would be unfair to conclude that counsel should have guessed, upon viewing the venire panel, that the process creating the master jury wheel was flawed and therefore entered an objection.

This case does not present a situation where counsel may have had suspicions regarding the venire panel but chose not to object based on trial strategy; here, I suggest, counsel could not reasonably have known of the underrepresentation problem until after trial. *Cf. United States v. Boulding*, 412 Fed. App'x 798, 802 (6th Cir. 2011) (no cause excusing failure to object where

counsel indicated that he only knew of the underrepresentation when he saw the jury panel and that "he failed to object during jury selection because he did not wish to alienate the jury"). I therefore recommend that cause be found to exist on this record.

As to prejudice, it is to be presumed when the alleged error is structural, and the systematic exclusion based on race in the selection of jurors is a structural error. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 257, 108 S. Ct. 2369, 101 L. Ed. 2d 228 (1988) (citing *Vasquez v. Hillery*, 474 U.S. 254, 260-64, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986) (racial discrimination in selection of grand jurors)). Thus, I suggest that prejudice exists in this case.

Having found that Petitioner's habeas claim is not barred by the doctrine of procedural default, I will turn to the merits of the claim.

### 2.    Merits

### a.    Applicable Standards

To establish a *prima facie* violation of the Sixth Amendment's right to a jury representing a fair cross section of the community, Petitioner must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community [cognizable prong]; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community [underrepresentation prong]; and (3) that underrepresentation is due to systematic exclusion of the group in the jury-selection process [systematic exclusion prong]." *United States v. Ovalle*, 136 F.3d 1092, 1098 n.7 (6th Cir. 1998) (citing *Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979)).

In the instant case, it is undisputed that African-Americans are a cognizable group. *Lockhart v. McCree*, 476 U.S. 162, 175, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986).[9] I also note that neither party contests that Garica-Dorantes, a Hispanic man, is able to bring forth his claim that African-Americans have been underrepresented, i.e., no one has challenged the ability of a person of one cognizable group to raise the fair-cross-section requirements of a different cognizable group. If such an argument were raised, it would fail. *See Powers v. Ohio*, 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991) (extending *Batson*[10] rule to hold that a prosecutor may not use peremptory challenges to exclude black prospective jurors from a white criminal defendant's jury on account of their race); *Echlin v. LeCureux*, 995 F.3d 1344, 1350 (6th Cir. 1993) ("The *Powers* Court made it clear, for the first time we believe, that the race of both the defendant and of the excluded juror are irrelevant to an equal protection analysis."). *See also Holland v. Illinois*, 493 U.S. 474, 477, 100 S. Ct. 803, 107 L. Ed. 2d 905 (1990) (white man had standing to raise a Sixth Amendment challenge to the exclusion of blacks from his jury); *Taylor v. Louisiana*, 419 U.S. 522, 526, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975) (Taylor could make a fair-cross-section claim that women were being excluded even though he was a man because "there is no rule that claims such as Taylor presents may be made only by those defendants who are members of the group excluded from jury service.").

However, the underrepresentation and systematic exclusion prongs are contested. As to underrepresentation, "[d]efendants are not entitled to a jury of any particular composition, but the jury wheels, pool of names, panels or venires from which juries are drawn must not systematically

---

[9]Hispanics are also a cognizable group. *Peters v. Kiff*, 407 U.S. 493, 92 S. Ct. 2163, 33 L. Ed. 2d 83 (1972).

[10]*Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor*, 419 U.S. at 538 (citations omitted).[11] "Thus, the Supreme Court has explained that the Sixth Amendment's 'fair cross-section' requirement applies only to the larger pool serving as the source of prospective jurors' names . . . ." *United States v. Riddle*, 691 F. Supp. 2d 737, 742 (E.D. Mich. 2010) (denying criminal defendant's motion to dismiss because defendant had "improperly focused on the composition of the 100 prospective jurors, rather than the process for creating the Master Wheel"). Therefore, if it can be shown that underrepresentation at the master jury wheel level was the product of systematic exclusion, the government may not defeat that claim by pointing to fair representation on the petit jury or the venire panel from which the petit jury was drawn.[12] *Id. See also Rabinowitz v. United States*, 366 F.3d 34, 59 (5th Cir. 1966) ("the

---

[11]The terminology used to describe the jury selection process is not consistent, possibly explaining the Court's reference to "jury wheels, pool of names, panels or venires from which juries are drawn." *Id.* For purposes of this Report, "master jury wheel," "jury wheel" and "pool of names" may be used interchangeably to denote the process of gathering names of potential jurors and narrowing those down to jury-eligible persons. "Venire panel" will be used to describe the weekly or monthly panel of persons called for jury duty from which the petit jury is drawn.

[12]I note that one district court case has held to the contrary. In *Parks v. Warren*, 773 F. Supp. 2d 715, 726-27 (E.D. Mich. 2011), the writ of habeas corpus was denied because, although the Kent County jury selection process as a whole resulted in underrepresentation of African-Americans in the jury pool, minority representation in the specific venire panel chosen from that pool at the petitioner's trial was proportionate with the minority representation in the community. The court stated that:

> although the respondent never brought these facts to the court's attention, in the [petitioner's] jury venire [panel] of 45 people, the affidavits demonstrate that the minority composition of the petitioner's jury venire was 8.89%. According to the census data, Kent County's total population of 574,375 people included 51,287 African Americans. Remarkably, the minority percentage of Kent County population was 8.93%. Therefore, the racial composition of the petitioner's jury venire reflected almost exactly the proportion of minorities in the community.

*Parks*, 773 F. Supp. 2d at 726. Although a phrase from *Taylor* was quoted in support of the holding, the additional language placed before the quoted phrase does not appear in the *Taylor* opinion. The *Parks* opinion states, "But even with a flawed system, if in a given case 'it may be fairly said that the jury lists or panels are representative of the community,' *Taylor*, 419 U.S. at 528 [sic], 95 S. Ct. 692, the Sixth Amendment fair representation requirement is satisfied." *Parks*, 773 F. Supp. 2d at 726-27. The full sentence in *Taylor* does not address situations where the minorities are systematically excluded at the level of the jury pool but the venire panel brought in for a particular defendant's jury trial or petit jury drawn from that panel is nonetheless representative of a fair cross section. Instead, the phrase is found in a sentence assuring the states of their remaining power over jury eligibility, and reads in full: "The States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community." *Taylor*, 419 U.S.

Government argues that the indictments should stand since there were, in fact, 5 Negroes on the grand jury . . . [but] this evidences a basic misconception. The focus of the law is on the list from which jury is drawn and not on the composition of a particular jury or grand jury.").

To allow a Sixth Amendment claim to be diffused by the government's showing that, despite the systematic exclusion of a cognizable group at the master jury wheel level, the particular venire panel or petit jury at issue was representative, would be to permit harmless error analysis where it is not permitted. Underrepresentation due to systematic exclusion is a structural error and, once proven, prejudice is presumed. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006) (systematic exclusion based on race from the jury pool is a structural error, prejudice is presumed, and harmless error analysis is not appropriate); *accord Vasquez v. Hillery*, 474 U.S. 254, 263-64, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986).

This conclusion is buttressed by the longstanding tenet that the "systematic and intentional exclusion of [a cognizable group] deprives the jury system of the broad base it was designed [] to have in our democratic society." *Ballard v. United States*, 329 U.S. 187, 195, 67 S. Ct. 261, 91 L. Ed. 181 (1946). "The injury is not limited to the defendant – there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts." *Id.*

As to the systematic prong, exclusion need not be intentional to be unconstitutional under the Sixth Amendment's fair-cross-section guarantee, but the exclusion must be systematic. *Duren*, 439 U.S. at 368 n.26. Systematic means "inherent in the particular jury-selection process utilized." *Id.* at 366.

---

at 538.

If a *prima facie* violation is established, the government is required to show that "a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group" in order to rebut the presumption. *Duren*, 439 U.S. at 367-68.

### b.   Application & Analysis

Dr. Stephenson concluded that the absolute disparity test "result indicates that there is a 6.03 percent difference between the percentage of eligible Black and African Americans in Kent County and the actual percentage in the venire." (Doc. 46 at 54.) Dr. Stephenson further concluded that the comparative disparity test showed that the *Bryant* trial "had 73.1% fewer Black or African American members than could have been expected in Kent County." (*Id.*) Dr. Stephenson suggests that neither the absolute nor comparative disparity tests are "viable for inferential purposes" because they are "not capable of identifying whether this group is statistically significantly underrepresented and small changes in the venire representation will unduly distort the analysis . . . ." (*Id.*)

Using the standard deviation and binomial tests, Dr. Stephenson concluded that there was "insufficient evidence to demonstrate that the representation of Blacks or African Americans <u>in the venire</u> is biased, this is in part due to the size of the venire." (*Id.* at 55 (emphasis in original).) After employing the Chi-square Goodness-of-fit test, Dr. Stephenson found that "there is essentially no chance of acquiring the results we obtained if the selection process for potential jurors is unbiased. As a result, there is overwhelming evidence to conclude that the selection process <u>for terms</u> during the first months of 2002 was biased." (*Id.* at 56 (emphasis in original).)

Dr. Rothman's analysis similarly concluded that the period between April 2001 and August

19

2002 revealed significantly more underrepresentation of African Americans than the earlier period studied. (Doc. 46 at 7, 9.) Dr. Rothman found that the absolute disparity between jury-eligible African Americans and those who appeared on jury venires was 3.45% between April 2001 and August 2002. (*Id.* at 1-2.) Dr. Rothman further concluded that the comparative disparity during this time period was 42%. (*Id.* at 2.)[13]

Thus, according to Dr. Stephenson, the relevant absolute disparity was 6.03% and the comparative disparity was 73.1%. According to Dr. Rothman, the relevant absolute disparity was 3.45% and the comparative disparity was 42%.[14] At least one Michigan court has found underrepresentation by using Dr. Stephenson's conclusions regarding a trial held within the same time period in Kent County as the trial in the instant case. *See People v. Bryant*, 289 Mich. App. 260, 796 N.W.2d 135 (2010) (underrepresentation shown in Kent County jury selection process in February 2002 using comparative disparity of 73.1% provided by Dr. Stephenson's report) (citing *United States v. Rogers*, 73 F.3d 774, 776-77 (8th Cir. 1996) (holding that comparative disparity of more than 30 percent satisfies the second prong of *Duren*)).[15]

Using either Dr. Rothman's or Dr. Stephenson's absolute disparity figures, i.e., 3.45% or 6.03%, Garcia-Dorantes has shown a percentage that exceeds the 3% that courts have recently found to be insufficient proof of underrepresentation. *See United States v. Mujahid*, 433 Fed.

---

[13]Dr. Rothman also concluded that the absolute disparity between jury-eligible African-Americans or Hispanics and those who appeared on venire panels between April 2001 and August 2002 was 4% and that the comparative disparity was 29%. (*Id.*)

[14]In *Berghuis v. Smith*, the United States Supreme Court rejected the Sixth Circuit's holding that comparative disparity results be used rather than absolute disparity or standard deviation analyses. Instead, the Court held that "neither *Duren* nor any other decision of this Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools." *Smtih*, 130 S. Ct. at 1393.

[15]The Michigan Supreme Court has granted leave to appeal. *People v. Bryant*, 489 Mich. 924, 797 N.W.2d 135 (2011).

20

App'x 559, 561 (9th Cir. 2011) ("An absolute disparity of 2.87% is insufficient to make a *prima facie* showing of substantial underrepresentation"); *United States v. Rodriguez-Lara*, 421 F.3d 932, 943-44 (9th Cir. 2005) (absolute disparity of 3% is too low to be evidence of underrepresentation and comparing cases finding 14.1% and 15.4% absolute disparity to satisfy second *Duren* prong); *United States v. Royal*, 174 F.3d 1, 10 (1st Cir. 1999) (absolute disparity of 2.9% insufficient to show underrepresentation).

However, neither Dr. Stephenson nor Dr. Rothman's figures would support a finding of underrepresentation if the standard requiring over 10% absolute disparity were used, as it has been in other circuits. *See United States v. Ashley*, 54 F.3d 311, 314 (7th Cir. 1995) ("a discrepancy of less than ten percent alone is not enough to demonstrate unfair or unreasonable representation of blacks on the venire"); *United States v. Suttiswad*, 696 F.2d 645, 649 (9th Cir. 1982) (7.7% absolute disparity not substantial); *United States v. Grisham*, 63 F.3d 1074, 1078-79 (11th Cir. 1975) (absolute disparity of "10 percent or less" does not satisfy the underrepresentation prong). However, the Sixth Circuit has not adopted this position and, thus, I suggest that it is not outcome-determinative here.[16]

If the comparative disparity figures are used, Garcia-Dorantes would be unable to show sufficient underrepresentation using Dr. Rothman's 42% but could find support by using Dr. Stephenson's 73.1% comparative disparity. *See United States v. Weaver*, 267 F.3d 231, 243 (3d Cir. 2001) (finding insufficient evidence of underrepresentation where comparative disparity was 40.01% for Blacks and 72.98% for Hispanics and absolute disparity was 1.23% for Blacks and

---

[16]I further note that the standard requiring that at least 10% underrepresentation be shown derives from a case that predates *Duren*, and does not discuss any statistical analysis. *See Swain v. Alabama*, 380 U.S. 202, 209, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965). I therefore suggest that its current applicability is dubious.

0.71% for Hispanics); *United States v. Chanthadara*, 230 F.3d 1237, 1257 (10th Cir. 2000) (comparative disparity of 40.89% and 58.39% was insufficient evidence of underrepresentation, comparing case which held that 68.22% was sufficient); *United States v. Clifford*, 640 F.2d 150, 155 (8th Cir. 1981) (46% comparative disparity was insufficient to show underrepresentation).[17]

Viewing the evidence in the light most favorable to Garcia-Dorantes, I suggest that the evidence is sufficient to support *Duren's* underrepresentation prong. As to systematic exclusion, I suggest that the instant case presents a more obvious example of exclusion "inherent in the particular jury-selection process utilized" than that in *Smith. Duren*, 439 U.S. at 366, 368 n.26. The evidence reveals that the exclusion was due to the confluence between entry of an erroneous population parameter, which understated the county population by 3.8 times, and the fact that the state file listed names in zip code order, from lowest to highest, where the lower zip codes represent areas outside the Grand Rapids metro area which have a much smaller African American population. (Doc. 46 at at 137-38.) Although the genesis of the erroneous population parameter remains unknown, I suggest that the parameter itself is systematic and inherent in the selection process. *See United States v. Jackman*, 46 F.3d 1240, 1242-43 (2d Cir. 1995) (recalling original systematic exclusion whereby jury questionnaires were not sent to Hartford residents because a computer programming error had caused the letter 'd' in 'Hartford' to communicate to the computer that all potential jurors from Hartford were deceased and thus unavailable for jury

---

[17]I note that Respondent's reliance on *United States v. Buchanan*, 213 F.3d 302, 310 (6th Cir. 2000), is misplaced. As Respondent noted, the Sixth Circuit did not calculate the absolute or comparative disparities. (Doc. 48 at 26.) More importantly, however, the Court's holding did not rest on its underrepresentation finding. Instead, the Court held that "even if statistics could be viewed as underrepresentative, the defendants did not present any evidence of 'systematic exclusion.'"

service).[18] I further suggest that the file given from the State of Michigan to the county, which listed potential jurors in order of zip code, is also systematic and inherent in the process.

Accordingly, I suggest that Garcia-Dorantes has presented sufficient evidence to establish a *prima facie* case of underrepresentation in violation of the Sixth Amendment's fair-cross-section requirement. Since the government has not attempted to establish that "a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process," I suggest that the *prima facie* case has not been rebutted. *Duren*, 439 U.S. at 367-68. I therefore recommend that claim six of Garcia-Dorantes' habeas petition be granted.

III. **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

---

[18]The case analyzed a later plan which allowed the jury clerk to omit certain names from the "picking list," e.g., names of jurors who had served the previous month. *Id.* at 1243. If the jury clerk did not have enough names on the "picking list," then the clerk would supplement that list with additional names from the new qualified wheel that included Hartford and New Britain. *Id.* at 1244. The court held that defendant established his *prima facie* case and that the government failed to rebut his showing. *Id.* at 1248.

23

Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Commissioner of Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co.,* 454 F.3d at 596-97.

s/ 𝕮𝖍𝖆𝖗𝖑𝖊𝖘 𝕰 𝕭𝖎𝖓𝖉𝖊𝖗

CHARLES E. BINDER
United States Magistrate Judge

Dated: January 5, 2012

### CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date: January 5, 2012                    By     s/Patricia T. Morris
                                            Law Clerk to Magistrate Judge Binder