UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTONIO GARCIA-DORANTES,

                Petitioner,                              Case Number 05-10172

v.                                                Honorable David M. Lawson
                                                  Magistrate Judge Charles E. Binder

MILLICENT WARREN,

                Respondent.
_____/

## OPINION AND ORDER ADOPTING IN PART REPORT AND RECOMMENDATION, OVERRULING IN PART RESPONDENT'S OBJECTIONS, AND GRANTING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Antonio Garcia-Dorantes, presently in the custody of the Michigan department of corrections, filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his convictions and sentences for second-degree murder and assault with intent to do great bodily harm less than murder. Counsel subsequently was appointed and filed an amended petition, which contained seven claims, including improper admission of his pretrial statements, which he alleged were involuntary and taken in violation of *Miranda v. Arizona*; violation of his rights under the Confrontation Clause; denial of a fair trial due to prosecutorial misconduct; ineffective assistance of trial and appellate counsel; denial of due process and equal protection rights through the systematic exclusion of minority jurors in Kent county; and violation his of Sixth Amendment right to a jury trial when the judge calculated his sentencing guidelines on the basis of judge-found facts.

On March 8, 2011, the Court filed an opinion and order denying all claims in the petition except claim VI, relating to the exclusion of minority jurors in Kent County. The Court referred the case to Magistrate Judge Charles E. Binder to conduct an evidentiary hearing and expand the record

as to the ethnic composition of the jury venire in the defendant's case.  The hearing was held on August 25, 2011, and the parties afterwards filed supplemental briefs on the question whether the petitioner's sixth claim should be allowed to proceed.  On January 5, 2012, the magistrate judge issued a report finding that (1) the petitioner's fair cross-section claim was subject to procedural default, because it was denied by the state court of appeals on the basis that the petitioner failed to object to the composition of the panel before the jury was sworn; (2) the petitioner had shown cause for his failure to object, because he could not have known of the computer glitch which led to the systematic exclusion of minority jurors from the venire; and (3) the petitioner did not need to show actual prejudice, because prejudice should be presumed in the case of an alleged structural error, such as a fair cross-section claim.  The magistrate judge recommended that the petitioner's fair cross-section claim be allowed to proceed.  Addressing the merits, the magistrate judge determined that  the petitioner presented a *prima facie* case of underrepresentation in violation of the Sixth Amendment's fair cross-section requirement and the state offered no compelling justification.  The magistrate judge, therefore, recommended conditionally granting the petition for writ of habeas corpus.  The respondent filed timely objections, and the petitioner filed a response to the objections.

## I.

The respondent filed four objections to the report and recommendation.  First, she says the magistrate judge erred in finding cause to excuse the procedural default.  Second, she argues that the magistrate judge was mistaken in concluding that prejudice can be presumed when assessing the procedural default defense, even when the error is structural.  Third, the respondent believes that the magistrate judge did not assess the evidence of racial disparity properly, and that the petitioner did not demonstrate that the computer glitch caused any such disparity.  Fourth, the respondent asserts

that *Duren v. Missouri*, 439 U.S. 357 (1979), and *Taylor v. Louisiana*, 419 U.S. 522 (1975), were decided wrongly, and she asserts that the Sixth Amendment does not guarantee the right to a jury selected from a fair cross-section of the community.

On June 28, 2012, the United States Court of Appeals for the Sixth Circuit decided a trio of appeals from decisions on habeas petitions raising fair cross-section claims based on the same Kent County juror selection computer glitch at issue in this case. *Ambrose v. Booker*, 684 F.3d 638 (6th Cir. 2012), *cert. denied* 133 S. Ct. 993 (2013) (also deciding *Carter v. Lafler* and *Wellborn v. Berghuis*). In each case the respondents asserted a procedural default defense based on the petitioners' failure to make a timely objection to the composition of the jury panel. The Sixth Circuit held that the petitioners in the context of the particular jury selection glitch at issue had established cause for the procedural default, because "where the underrepresentation is as obscure as the one in this case . . . a failure to object must be excused." *Ambrose*, 684 F.3d at 649. However, the court also held that to excuse a procedural default, a petitioner "must show that he was actually prejudiced regardless of the nature of the underlying constitutional claim." *Id.* at 651. Demonstrating actual prejudice requires a showing that "there was a reasonable probability that 'a properly selected jury [would] have been less likely to convict.'" *Id.* at 652 (quoting *Hollis v. Davis*, 941 F.2d 1471, 1482 (11th Cir. 1991) (alteration in original)).

## A.

The *Ambrose* decision addresses at least two of the issues the respondent raises in her four objections to Judge Binder's report. The first objection is that the magistrate judge erred in finding that cause for the procedural default was established. *Ambrose* confirms the correctness of the magistrate judge's finding on that issue, and the respondent's objection must be overruled.

-3-

B.

The respondent's second objection — that prejudice cannot be presumed in the procedural default context — has merit.  The *Ambrose* court held that the petitioner must show actual prejudice.  Neither party addressed actual prejudice in their briefing.  In fact, the attorney general apparently confused this case with another, contending that the petitioner was sentenced in state court for armed robbery and possession of a firearm.  (This is a murder case involving a knife.)  Therefore, on July 23, 2012, the Court ordered the parties to submit supplemental briefs on the issue of actual prejudice, and instructed the parties that "[t]he briefs should include references to specific parts of the record that either highlight or undermine the strength of the prosecution's case."  The parties filed timely briefs in response to the Court's order.

The petitioner argues that he did suffer actual prejudice as a result of the underrepresentation of African-American jurors in his venire, because (1) the evidence was "remarkably close on the only disputed issue at trial — [his] state of mind during a street fight"; (2) "the trial involved issues to which racial minorities are likely to be uniquely sensitive, including the threat of gang violence in unfamiliar urban neighborhoods"; and (3) "reliable scientific evidence shows that in virtually *all* cases, increased minority participation on juries decreases the likelihood of conviction." Pet'r's Supp. Brief at 2 (emphasis in original).

The respondent argues that the petitioner cannot establish that actual prejudice occurred because (1) "solid eyewitness testimony identified Petioner as the man who attacked Jose Gomez and the person who stabbed and injured Manuel Garcia"; (2) "physical and scientific evidence linking Petitioner to the crimes supported the identification testimony and undermined portions of Petitioner's multiple versions of events"; (3) "Petitioner's own contradictory statements and trial

testimony, and the failure of the other defense witnesses to provide any support for the claim that Petitioner killed in self-defense substantially weakened the defense"; and (4) "there were no racial or ethnic undertones of any kind in this case such that a jury selected in the absence of the Kent County computer glitch . . . would have acquitted or found Petitioner guilty of lesser offenses."

The Sixth Circuit has explained that "[t]he most important aspect to the [prejudice] inquiry is the strength of the case against the defendant." *Ambrose*, 684 F.3d at 652. One possibility is that the "transcript could show a case against petitioner so strong, and defense so weak, that a court would consider it highly improbable that an unbiased jury could acquit." *Ibid.* (quotation marks and alterations omitted). However, in a close case, where the "jury's verdict rested on a narrow ground," the petitioner may be able to show "a reasonable probability that . . . the result of the proceeding would have been different," if the case had been presented to an unbiased jury. *See Foster v. Wolfenbarger*, 687 F.3d 702, 710 (6th Cir. 2012). In addition to the strength of the prosecution's case, the Court may also consider "the race of the jurors, defendant, and victim," where relevant. *Ambrose*, 684 F.3d at 652 n.4. If the facts and circumstances of the case suggest that "[comparing] the result reached by an all white jury, selected by systematic exclusion of blacks, with the result which would have been reached by a racially mixed jury, [the Court] would have greater confidence in the latter outcome, finding much less probability that racial bias had affected it," then this also may support a finding that actual prejudice resulted from the systematic exclusion of jurors of a particular race from the venire. *Ibid.* (citing *Huffman v. Wainwright*, 651 F.2d 347, 350 (5th Cir. 1981)). The actual prejudice standard that the Court must apply is the same standard that governs ineffective assistance of counsel claims under *Strickland v. Washington*, 466 U.S. 668 (1984). *Ambrose*, 684 F.3d at 652.

-5-

This Court discussed the background facts and procedural history of the case at length in its prior opinion and order. However, the factual context of the case is worth repeating here due to the weight accorded to "the strength of the prosecution's case" in the prejudice inquiry.

The petitioner was involved in a fight and stabbed two people, one fatally, in Grand Rapids, Michigan in the early morning hours of October 22, 2000. He was charged with open murder and assault with intent to do great bodily harm. Following a jury trial, he was convicted of the lesser crime of second-degree murder and assault with intent to do great bodily harm less than murder.

Jose Gomez, the homicide victim, died from a single stab wound to his upper chest, just beneath his collar bone. A 3-3/8 inch stab wound penetrated his left lung and punctured his pulmonary artery. The medical examiner determined that Gomez had been intoxicated at the time of the fight, with a blood alcohol level of .31 percent. Although the medical examiner testified that most persons would be comatose with a blood alcohol level above .30 percent, he could not discount the possibility that Gomez could have attacked someone in a fight situation if he was a habitual drinker.

Manuel Garcia was the assault victim. He worked for Gomez. The two men had been drinking that night until about 4:00 a.m. They arrived at Gomez's house with a third companion, Gonzalo Ramirez-Toledo. When they drove up, the petitioner's truck was parked across the street. The petitioner testified that he thought the men were part of a gang and that they had tried to force him off the road during an earlier encounter that night.

The petitioner was standing outside of his truck. Gomez got out of Garcia's truck and walked toward him, stating that he "did not want any problems"; he told the petitioner that he should leave or Gomez would call the police. Garcia and Ramirez-Toledo then got out of Garcia's truck

-6-

and approached the petitioner. Two other persons had also exited the petitioner's truck. Ramirez-Toledo said the petitioner had his hand behind his back when he first saw him standing beside his truck. Ramirez-Toledo said he did not see what occurred between the petitioner and Gomez, nor did he see a knife in the petitioner's hand.

Garcia testified that when Gomez asked the men to leave, the petitioner replied "And if I don't want to?" and punched Gomez in the face. Gomez fell down, got up again and "threw himself" at the petitioner. Garcia acknowledged that he did not see which man started the fight. As Garcia attempted to break the fight up, he felt a cramp in his leg and later learned that he had been stabbed in the buttock. Garcia was also stabbed in the back of his neck. Garcia testified that the petitioner then threatened him with a bottle. Ramirez-Toledo testified that Gomez asked him to call the police. As Ramirez-Toledo did so, one of the petitioner's friends hit him in the head with a bottle. Ramirez-Toledo then heard Gomez say, "Let's go." Ramirez-Toledo observed petitioner get into his truck and leave the area, squealing his tires as he left. Gomez, Garcia, and Ramirez-Toledo got into Garcia's truck. Once inside, Garcia noticed that Gomez was very bloody. Garcia drove Gomez to the hospital. The petitioner and his companions had left the area already.

While driving Gomez to the hospital, Garcia passed the petitioner's truck when it stopped at a stop sign. When Garcia stopped at a red light, the petitioner drove up and crashed into the rear of Garcia's truck. Garcia continued driving but claimed that the petitioner crashed into his pickup truck two more times. Garcia drove to Gomez's brother's house, where they called the police and an ambulance.

Police responded to a dispatch of a shooting to an address on Rose Street. Upon arrival, emergency medical personnel informed the police that it had actually been a stabbing and Gomez

-7-

had died.  Officers then received a dispatch for a "hit and run" and went to the petitioner's house.

The police were informed that the petitioner had been involved in a hit and run accident.  They

noticed damage to the front of the petitioner's vehicle.  They arrested the petitioner and his friend

named Christian Diaz.

Police Officer John Riley testified that he interviewed the petitioner in the early morning

hours of October 22, 2000.  Riley ascertained that the petitioner spoke very little English.  Riley

testified that he was "pretty fluent" in Spanish, and he read the petitioner his *Miranda* rights in

Spanish.  Thereafter, the petitioner made two verbal statements.  In his first statement, he blamed

his wife for the truck crash and resulting damage.  Later that afternoon, he made a second statement

in which he admitted to having been involved in a fight.  The petitioner told the police that he

thought that Gomez and his friends were "gangbangers" who had threatened him earlier.

Detective Gregory Griffin was present when both statements were made.  He testified that

although he found no evidence that any of the persons involved in this altercation were gang

members, he could not rule out that Gomez was a gang member.

The petitioner testified on his own behalf at trial, explaining that he was celebrating his

daughter's birthday on October 21, 2000.  He and his friends later left the party to go to his

girlfriend's house, with whom he was having an extramarital affair.  The petitioner parked in front

of the house and went to the door.  When there was no answer, he returned to his truck.  It was then

that he saw Garcia's truck arrive.  The petitioner claimed that Garcia had tried to ram him with his

truck earlier that day and had tried to run the petitioner off the road.  He thought Gomez, Garcia, and

Toledo were gang members.  According to the petitioner, a person from the victim's truck provoked

the fight.  When others joined in, he became scared and pulled a knife, thrusting it once as a person

-8-

lunged at him.  That man left and his friends followed.  The petitioner claimed that when he went to drive away, the men pulled their truck in front of him and "locked" their brakes, causing the petitioner's vehicle to collide with their truck.

The petitioner went home and told his wife about the accident.  He said his wife volunteered to tell the police that she had been driving because the petitioner was intoxicated at the time.  The petitioner denied intending to harm anyone.

The petitioner's common-law wife, Anayeli Castellanos, testified that the petitioner woke her in the early morning hours of October 22, 2000 and informed her that someone had crashed into his truck.  The petitioner demanded that she call the police to report the incident.  The police arrived and arrested the petitioner.  Castellanos admitted that she suggested that the petitioner inform the police that she had been driving because petitioner appeared scared and had been drinking.

The petitioner argued that he acted in self-defense, and that the crime was no worse than manslaughter.  The jury found him guilty of the lesser offense of second-degree murder in Gomez's death and assault with intent to do  great bodily harm less than murder as to Garcia.  The petitioner concedes that he stabbed and killed Jose Gomez during a street fight.  But he says that a close question was presented as to his state of mind and therefore whether his conduct amounted to first-degree murder, second-degree murder, voluntary manslaughter, or lawful self-defense.  He reasons that because the case was close, a properly constituted jury would have been less likely to convict.

Based on the record evidence, it is not reasonable to find that the "case against petitioner so strong, and defense so weak, that a court would consider it highly improbable that an unbiased jury could acquit." *Ambrose*, 684 F.3d at 652.  A strong contrast can be drawn between the evidence in this case and that in other cases where jury irregularities were not found to cause prejudice.  *See,*

*e.g., Francois v. Wainwright*, 741 F.2d 1275 (11th Cir. 1991) (defendant attempted to execute six robbery witnesses, killing five, admitted to a prosecution witness that he had done the shooting, and was positively identified by the surviving victim); *Godfrey v. Kemp*, 836 F.2d 1557, 1570 (11th Cir. 1988) (the defendant "was found at the scene of the killings, it was his telephone call that led the police there, and he never denied having committed the murders")

In contrast with the cases discussed above, the Sixth Circuit has found prejudice where the evidence was more equivocal as to a central element of the crime, such as the identity of the killer, as in *Foster v. Wolfenbarger*, 687 F.3d 702, 709 (6th Cir. 2012):

> [T]he only witness who could identify [defendant] at the scene of the crime. . . . told the police that the assailant was 5'6" or 5'7" and weighed 180 pounds, while [defendant] is 6'0" and approximately 240 pounds. In addition, while [the witness] testified at trial that the assailant was wearing a green jacket of the same type as the man she saw [earlier], she was successfully impeached with her preliminary hearing testimony that the assailant was wearing a blue jacket. By any standard this is a weak identification. Moreover, [this] identification is the only direct link of [the defendant] to the crime — there was no forensic evidence recovered at the scene.

687 F.3d at 709. The Sixth Circuit has emphasized that in evaluating whether prejudice occurred, "[a]lthough the circumstantial evidence alone might have led to a conviction, the question before us is not one of the sufficiency of the evidence, but of undermining our confidence in the reliability of the result. In addition, witnesses are not always believed." *Richey v. Bradshaw*, 498 F.3d 344, 364 (6th Cir. 2007).

In *Phillips v. Woodford*, 267 F.3d 966 (9th Cir. 2001), the Ninth Circuit confronted a case similar to the present matter, where the defendant did not challenge the fact that he killed the victim, but only challenged the specific element of mental state as an aggravating factor at the penalty phase of the trial. The court of appeals summarized the facts of the case:

[Defendant] got out of the Toyota and spoke for some time to [the first victim,] Rose[,] and [the second victim,] Bartulis[,] through the Ranchero driver-side window. At some point, [the witness] heard shots fired and as a result, she looked up and saw [defendant] holding a gun. [Defendant] took Rose's and Bartulis's wallets which contained a total of $120 to $150 and brought them back to the car. He then set the Ranchero on fire using gasoline he obtained from the trunk of the Toyota. Rose, who was still alive, jumped out of the burning Ranchero. Upon realizing that Rose was still alive, [defendant] drove the Toyota into Rose and hit him, also cracking the Toyota's windshield. Upon first finding the wallets and again while driving away from the shootings, [defendant] lamented not finding more money than he did.

[Defendant] alleges that Bartulis was killed in a shoot-out. According to [defendant's] declaration, he fired his weapon at Rose and Bartulis only after "he heard the 'click' of a hammer going back on a revolver"; he also declares that he "found a large revolver in Rose's hand after the shooting." [Defendant] contends that Bartulis was killed not by his bullet but by Rose's, and that he will be able to establish as much if given the opportunity to develop facts at an evidentiary hearing.

*Phillips*, 267 F.3d at 972. The court concluded that:

[I]f a "shoot-out" defense had been presented at trial, the jury might well have found that [defendant] did not form the intent to steal until after the killing, thus necessitating the conclusion that special circumstance 190.2(c)(3)(i) did not apply to [him]. In such case, [defendant] could not have been sentenced to death. . . . [W]e conclude that [the defendant] has raised a colorable claim of prejudice, a sufficient showing to entitle him to an evidentiary hearing on his ineffective assistance of counsel claim.

*Id.* at 983.

There is no question that the trial record here discloses sufficient evidence on which a jury could have found that Garcia-Dorantes acted with malice and therefore reasonably could have found him guilty of second-degree murder. But "the question before [this Court] is not one of the sufficiency of the evidence." *Richey*, 498 F.3d at 364. The evidence of the petitioner's state of mind — his intent — was hardly overwhelming. Even if the jury accepted as true Ramirez-Toledo's testimony that the petitioner had his hand behind his back when Gomez and his companions stepped out of their truck, it could still reject the inference that the petitioner was hiding his knife behind his

-11-

back and accept the petitioner's contention that he only took his knife out after Gomez and his companions "jumped" at the petitioner.  The forensic evidence that the penetrating wound in Gomez's chest would have required a "strong" thrust is consistent with the petitioner's admission that he "thrusted" the knife in order to ward off an attack, and the jury might still believe that he did so blindly, or with an intent only to ward off an assault rather than to kill.  Moreover, all of the witnesses agreed that the petitioner and his companions fled the scene first, indicating that he did not press the attack when Gomez and his companions retreated.  The petitioner's testimony is questionable given his contradictory statements to police about the circumstances of his car accident and the origin of the blood recovered from his shoes and clothes, but if the jury nevertheless accepted his version of events, then it reasonably could have concluded that he committed manslaughter only or that he acted in self-defense.

The petitioner has presented evidence from an expert social psychologist that juries with more minority members are less likely to convict regardless of the crime, and he argues that this opinion supports the conclusion that there is a reasonable probability that a properly selected jury would have been less likely to convict.  However, even if the Court credits the petitioner's showing on this point as true, it is irrelevant to the question of actual prejudice.  A properly selected jury could well have been all white, with no minority members at all.  The petitioner is not entitled to a more lenient jury, or a jury panel with a particular racial balance — just one that has been selected through a constitutionally sound process, regardless of the race of the members. *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975).  The question is not whether the petitioner missed his chance to stand trial before a more merciful jury panel or a panel with a particular racial balance, but rather whether there is a reasonable probability that a different jury would have reached a different result.

However, the petitioner has raised a credible claim that on the facts of this case, "[a] mixed-race jury might clearly have a special perception." Because African-American and Hispanic jurors from more urban areas would be more likely to have encountered gang violence than suburban white jurors, they may have better understood the situation that the petitioner faced in a 4:00 a.m. confrontation with a person who he thought was a gang member, and a jury selected from a fair cross-section of the Kent County community therefore might have had a different perception of and reached different conclusions about the state of mind that the petitioner had during the resulting street fight. As the petitioner points out, none of the witnesses — including petitioner — testified to having a precise memory of what happened at the moment Jose Gomez was stabbed. Because the evidence on the petitioner's state of mind reasonably allowed for competing inferences, the subjective perceptions, life experience, and common sense of the jurors, as shaped by their individual racial and cultural backgrounds, would carry considerable weight in deciding what precise intent the defendant had at the crucial moment. That observation applies with equal force to the question whether the petitioner intended to inflict great bodily harm when he stabbed Manuel Garcia.

Based on the facts and circumstances of the case, when comparing the result reached by a jury "selected by systematic exclusion of blacks, with the result which would have been reached by a racially mixed jury, [the Court] would have greater confidence in the latter outcome, finding much less probability that racial bias had affected it." *Ambrose*, 684 F.3d at 652 n.4.

The Court concludes that there is a reasonable probability that a fairly selected jury would have been less likely to convict the petitioner, and the record does not disclose "a case against petitioner so strong, and defense so weak," as to make it "highly improbable that an unbiased jury

could acquit." The petitioner therefore has shown that he suffered actual prejudice as a result of the Kent County jury selection glitch that systematically excluded minority jurors from his venire. It is appropriate, therefore, to address the merits of the petitioner's fair cross-section claim.

### C.

The magistrate judge concluded that the petitioner established a *prima facie* case that minorities were underrepresented on the petitioner's jury pool  in violation of the Sixth Amendment's fair cross-section requirement.   The respondent objected to the magistrate judge's consideration of the evidence presented on this point and his application of Sixth Circuit law.

### 1.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), require federal habeas courts to give great deference to state court decisions on the merits of constitutional questions in criminal cases.  As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998).   Also, the Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

This narrow standard of review does not apply when the state court does not address a constitutional claim on the merits. The Sixth Circuit has held that a "state court may have various reasons for denying an application for leave to appeal 'for lack of merit in the grounds presented,'" but a federal court cannot "discern from that language alone whether that decision was based on the merits of the case." *Dorn v. Lafler*, 601 F.3d 439, 443 (6th Cir. 2010). Where the federal court is unable to "conclude that it was an 'adjudication on the merits' pursuant to 28 U.S.C. § 2254(d)," as here, a more conventional standard of review is appropriate. *Ibid.* The approach espoused by *Dorn* was called into doubt by *Harrington v. Richter*, --- U.S. ---, 131 S. Ct. 770 (2011), which held that "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" 131 S. Ct. at 785. The Supreme Court stated that when a claim is presented for adjudication to a state court, there is a presumption "that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 784-85. "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785.

Regardless of the continued validity of *Dorn v. Lafler*, the presumption has been overcome in this case. The state court expressly declined to reach the merits of the fair representation claim due to lack of objection to the venire in the trial court. The procedural posture of this case is the same as the court of appeals found in *Ambrose v. Booker*. There, as here, "it is evident that the state courts rejected petitioners' fair cross-section claims on procedural grounds, based on the failure to object to the jury panel at trial. For this reason, AEDPA deference does not apply and the court reviews legal conclusions de novo and findings of fact for clear error." *Ambrose*, 684 F.3d at 644-45 (citing *Dyer v. Bowlen*, 465 F.3d 280, 283-84 (6th Cir. 2006)).

-15-

2.

The Sixth Amendment "secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010) (citing *Taylor v. Louisiana*, 419 U.S. 522 (1975)).  In order to establish a *prima facie* violation of the fair cross section requirement, the petitioner must prove three elements: "(1) that the group alleged to have been excluded is a 'distinctive group' in the community; (2) that the representation of that group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation is due to the systematic exclusion of the group in the jury selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).  If the petitioner makes out a *prima facie* violation, then the burden shifts to the State to show a "significant state interest [that is] manifestly and primarily advanced by those aspects of the jury-selection systems, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Id.* at 367-68.

The magistrate judge concluded that the evidence established that minorities were systematically excluded from Kent County's jury pool and were underrepresented.  A review of that evidence is appropriate here.

At the evidentiary hearing in this case held on August 25, 2011, the parties stipulated to the admission of the following evidence that was admitted at prior hearings: (1) the transcript of the evidentiary hearing held on October 26, 2009 in an earlier case dealing with the same Kent County jury irregularity, *Parks v. Warren*, No. 05-10036 (E.D. Mich.), which contained the testimony of Wayne Bentley, a Grand Rapids Public Schools teacher who since 1998 has been a member of the Kent County Jury Commission, which oversees the Kent County jury processes; (2) the deposition

-16-

of Terry Holtrop, with exhibits; (3) the report of Dr. Paul Stephenson; and (4) the report of Dr. Edward B. Rothman. *See* Hearing Exhibits [dkt. #46].

Wayne Bentley testified that for ten years, he sent students from his government class to the Kent County circuit court to "go into the jury assembly room and count the minorities in the pool." Evid. Hr'g Tr. [dkt. #46-1] at 15. "[F]or the better part of ten years, at least once a month we counted minority jurors every day for that month, and we did it right on through 2003." *Ibid.* Bentley described several irregularities in the Kent County jury system, but the one that has direct relevance to the petitioner's October 2001 trial had its origin in the summer of 2001. Bentley testified that is when he noticed the absence of African-Americans from jury venires. That prompted Bentley to file a FOIA request asking for addresses of all jurors summoned for a potential pool. After he received and analyzed the response, he learned that minority representation for the residents from the 49507 zip code area, which is the second largest population zip code, and has ninety percent African-American population, was "8.4 standard deviations below the norm," while representation of residents from the 49343 zip code, which is a predominantly white suburb of Rockford, was "4.7 standard deviations above the norm." *Id.* at 27, 36.

Ultimately, a computer error was found to be the culprit. Terry Holtrop, a case management manager from Kent County, testified that after Bentley raised his concerns during Kent County Jury Commission meetings, the issue "came to a head" in September 2001, when Bentley became "very vocal about it." Holtrop dep. [dkt. # 46-2] at 9. Holtrop described the computer error as follows:

> My understanding is that a programmer, not intentionally, pulled — only pulled jurors from basically two zip codes, I believe, instead of the entire county. So that resulted in most of the jurors being summoned from an area that is considered mostly white.

-17-

*Id*. at 21.  Holtrop explained that out of approximately 450,000 residents in the county, the program

selected only 118,000, *id*. at 21-22, as a result of which "not only were the jurors geographically

skewed, but they tended to be ethnically skewed as well," *id*. at 23.

On August 1, 2002, the Kent County IT department issued a report, which included an

exhaustive explanation of the computer error.  The report stated:

> Beginning in 2001, Kent County Information Technology (KCIT) began a project,
> using County IT staff, to move this entire process of updating and loading the State
> File into an Oracle database.  The reasons behind this move were 1) cost cutting —
> to eliminate the annual payment to ACS for this effort and 2) timeliness — in that
> we were dealing with a vendor at a remote location and there was a significant lead-
> time requirement in getting an updated State File returned to Kent County so that it
> was available in jury p[ools].  The net effect of this incorrect parameter is that the
> Jury Management System performed a random selection against the first 118,169
> prospective jurors on the file.
>
> It has been determined that in the initial set-up of the Oracle database to
> accommodate the driver's license and State ID data from the State File, an error was
> made in one parameter.  Whether this was a programming error, the carry-over of a
> setting that existed within the Sybase database, misinterpreting instructions, or
> simply human error, that is now almost impossible to determine.  The parameter that
> was entered within the database was 118,169.  What should have been inserted
> within this setting was the total number of records in the State File, or 453,981 in
> 2001.
>
> The net effect of this incorrect parameter is that the Jury Management System
> performed a random selection against the first 118,169 prospective jurors on the file.
> The percentage of jurors selected per Zip Code was proportional to the Zip Code
> composition of the first 118,169 records — but not Kent County as a whole. . . .
>
> The next logical question being, why then did the jury p[ool] from Zip Code 49341
> jump so dramatically for 2001, from an average of 3.8% up to 10.24% . . . and why
> did the jury p[ools] from Zip Code 49507 decline from an average of 8.56% to
> 2.13%?
>
> The answer being that in 1998 . . . the State File did not come in random order, but
> rather in Zip Code order . . . lowest numbers to highest numbers.  In subsequent
> years, new prospective jurors (either based on age or having moved to the County)
> were added to the end of the dataset.  Existing prospective jurors (those that were on
> the file the previous year) would simply have address information updated based on

-18-

what the State provided.  Their position in the dataset would not change.  Therefore, the first 118,169 records of the dataset have a high percent of the lower numbered zip codes.  As is indicated on the map included in this packet, all the Zip Codes with the lower numbers are located outside of the Grand Rapids metro area.
. . .

In 2001, the process of changing databases from the Jury Management System . . . was the genesis behind a mistake that was made in the database configuration.  An incorrect parameter "told" the jury selection software that the total available pool size was only 118,169 individuals, when in fact it was much larger.  The random selection process on the 118,169 records was proportionately correct for that pool size, but not the County in total.

For the time period of April 2001 to July 2002, the number of jurors pulled from Zip Codes that began with 493 . . . was larger than normal, on a proportional basis.

Holtrop dep., Ex. 3, Kent County Jury Management System Report [dkt. # 46-2], at 137-38.

According to Holtrop, once the problem was corrected in mid-2002, there was a discernible increase in minority participation. Holtrop dep. [dkt. # 46-2] at 52; *see also* Holtrop dep., Ex. 6, Jury Management Study, Kent County, Michigan, Rev. July 1, 2003 [dkt. # 46-2] at 86 ("The problem has been recognized and has been resolved.  Panels selected after August 2002 should not have the zip code bias.").  After the problem was eliminated, the "Black representation went from 2.89% to 4.9% of the respondents."  Jury Management Study [dkt. #46-2] at 93.

The record in this case contains reports by two expert witnesses.  The first report is by Paul L. Stephenson III, Ph.D., which was made for Kent County Circuit Court Judge Dennis Kolenda in the case of *People v. Bryant*, Kent County Docket No. 01-08625-FJ, and covers only January 2002, the month of Bryant's jury selection.  Citing the 2000 United States Census data, Dr. Stephenson determined that 8.2 percent of the Kent County population of 18 years and older is Black or African-American, either alone or in combination with one or more other races. Paul L. Stephenson III, Ph.D., *A Statistical Analysis regarding the Potential Systematic Exclusion of Black or African*

*Americans in the Jury Pools for the Kent County Circuit Court in Jan. of 2002*, Evid. Hr'g Tr., Ex. 2 [dkt. # 46-3].  Out of 45 potential jurors who were selected for the venire in Bryant's case, only one was Black or African-American.  Stephenson concluded that "there is a 6.03 percent difference between the percentage of eligible Black and African-Americans in Kent County and the actual percentage in the venire." *Id*. at 45.  Comparing this disparity to the population as a whole, Stephenson found that the venire for Bryant's trial had 73.1 percent fewer Black or African-American members than could have been expected in Kent County.  Dr. Stephenson opined that "there is essentially no chance of acquiring the results we obtained if the selection process for potential jurors is unbiased," and "all the areas in Kent County with zip codes less than or equal to 49504 were underrepresented." *Id*. at 47-48.  However, despite concluding that "systematic bias did exist in the selection of individuals summoned for jury duty during the first three months of 2002, . . . [which] would have inevitably led to the under representation of Black or African-Americans in the terms during this period of time," *id*. at 49, Dr. Stephenson opined that since the venire in *People v. Bryant* contained at least one Black or African-American potential juror, "there is insufficient evidence to conclude that the venire in this case was significantly biased," *id*. at 49.

The record also contains the report of Dr. Edward B. Rothman of the University of Michigan, who calculated the difference in the number of African-Americans in the population and those in the jury pools from April 2001 through August 2002 to be 3.45 percent, which translated into a 42 percent decrease in the likelihood that African-Americans would be found in the jury pool during that time period compared with what their census population suggested it should be. Evid. Hr'g Tr., Ex. 3, Report of Dr. Edward Rothman [dkt. # 46-4] at 1-2.  Dr. Rothman noted a "sharp change from April 2001 through August 2002" in the number of African-Americans on the jury roll, and another

-20-

change after August 2002. *Id*. at 7; *see also id*. at 9 ("The average estimated proportion of African-Americans or Hispanics has decreased substantially from the January 1998 through March 2001 time period to the April 2001 through August 2002 time period. The difference is statistically significant. . . .").

3.

In her objections, the respondent attacks the magistrate judge's conclusion that systematic underrepresentation of minorities occurred in Kent County during the relevant time on several bases. First, she argues that the magistrate judge erred because he "did not give the appropriate weight and consideration to Dr. Rothman's report and statistics in determining whether Petitioner had made out a prima facie case of systemic exclusion for purposes of *Duren v. Missouri*, 439 U.S. 357 (1979)." According to the respondent, Rothman's report is "*the* controlling document" for the purpose of the statistical inquiry, because it was based on an analysis of the entire period during which the Kent County jury selection computer glitch was in effect. The respondent maintains that the difference between Dr. Rothman's results and those of Dr. Stephenson is crucial, because "it is important to demonstrate disparities that occur in venires *over time*," citing *Ford v. Seabold*, 841 F.2d 677, 685 (6th Cir. 1998) (noting a discrepancy that occurred "in every weekly venire for a period of nearly a year").

That argument fails for a number of reasons. Contrary to the respondent's contention, the magistrate judge did not discount Dr. Rothman's results, and he concluded that a significant disparity was shown under either analysis:

> Using either Dr. Rothman's or Dr. Stephenson's absolute disparity figures, i.e., 3.45% or 6.03%, Garcia-Dorantes has shown a percentage that exceeds the 3% that courts have recently found to be insufficient proof of underrepresentation. *See United States v. Mujahid*, 433 F. App'x 559, 561 (9th Cir. 2011) ("An absolute

-21-

disparity of 2.87% is insufficient to make a prima facie showing of substantial underrepresentation"); *United States v. Rodriguez-Lara*, 421 F.3d 932, 943-44 (9th Cir. 2005) (absolute disparity of 3% is too low to be evidence of underrepresentation and comparing cases finding 14.1% and 15.4% absolute disparity to satisfy second *Duren* prong); *United States v. Royal*, 174 F.3d 1, 10 (1st Cir. 1999) (absolute disparity of 2.9% insufficient to show underrepresentation).

Rep. & Rec. [dkt. #50] at 20-21.

Moreover, the authorities cited by the respondent do not establish the rules she evidently would propose, that statistical evidence covering the entire period during which an alleged discriminatory procedure was in place is more "controlling" than evidence drawn from a shorter period, or that evidence must cover the entire period of an alleged discriminatory scheme's operation in order to be relevant. In *Duren* the Supreme Court considered evidence based on records from "June — October 1975 and January — March 1976," which comprised eight months out of a ten-month period leading up to and including the month in which the petitioner's jury was selected. *Duren*, 439 U.S. at 362. But the state constitutional provision that allowed women to claim an exemption from jury service had been present in Article 1 of the Missouri Constitution since at least 1945. Mo. Const. of 1945, Art. 1, § 22(b); *State v. Cole*, 354 Mo. 181, 189, 188 S.W.2d 43, 48 (1945).

As the respondent points out, "neither *Duren* nor any other decision of [the Supreme Court] specifies the method or test courts must use to measure the representation of distinctive groups in jury pools." *Smith*, 559 U.S. at 329. And the central inquiry under the *Duren* analysis is not, as the respondent contends, whether the exclusion occurred "over time," but rather whether the statistical evidence establishes "that the cause of the underrepresentation was systematic — that is, inherent in the particular jury-selection process utilized." *Duren*, 439 U.S. at 364. The Court found that the evidence presented in *Duren* did "manifestly indicate[] . . . that the under-representation was

-22-

systematic," *ibid.*, but it did not hold that evidence from a shorter period would not have sufficed, or that evidence from a longer period was entitled to "controlling" weight over a study from a shorter period. Rather than disregarding either of the studies, the magistrate judge concluded that the petitioner could establish based on the largely consistent conclusions of both reports that the statistical underrepresentation observed in Kent County venires was both "systematic" and "inherent in the particular jury-selection process utilized," particularly in light of the undisputed testimony by Kent County Jury Commissioner Wayne Bentley that a well-documented "glitch" in the County's jury selection computer program had introduced an apparent and significant programmatic error into the selection process.

The respondent cites *United States v. Horne*, 4 F.3d 579 (8th Cir. 1993), for the proposition that a disparity within a single venire is insufficient to establish underrepresentation under *Duren*. Perhaps, but in *Horne* the defendant's statistical presentation related *only* to the panel from which the jurors in his particular case were selected. *Id.* at 588. Here, the Stephenson study covered the first three months of the year 2002 — a period during which the parties agree that the computer glitch was in effect. The challenged report therefore is not confined only to the singular panel from which the petitioner's jury was drawn. And the respondent does not point to any evidence in the record suggesting that the glitch had a differential or varying effect on jury selection results during any particular part of the time that it was known to be in operation.

Second, the respondent contends that the magistrate judge erred in accepting the disparity established by the Rothman report as sufficient to show significant underrepresentation, citing cases from other circuits that have "rejected similar or even greater absolute and comparative disparities." *See* Resp.'s Supp. Brief [dkt. #48], Ex. 1. The respondent also contends that the magistrate judge

-23-

erred in rejecting the rule adopted in certain other circuits requiring a minimum of 10% absolute disparity for a finding of significant underrepresentation, because the seminal case from which that rule derives, *Swain v. Alabama*, 380 U.S. 202 (1965), pre-dates *Duren*.

Considering the absolute disparity figures cited by Dr. Rothman (3.45%) and Dr. Stephenson (6.03%), the magistrate judge noted that three recent cases have found an absolute disparity of 3% or less to be insufficient under *Duren*. *United States v. Mujahid*, 433 F. App'x 559 (2011) (absolute disparity of 2.87% insufficient); *United States v. Rodriguez-Lara*, 421 F.3d 932 (9th Cir. 2005) (3%); *United States v. Royal*, 174 F.3d 1 (1st Cir. 1999) (2.9%). The magistrate judge also noted that neither absolute disparity figure would suffice under the standard requiring a minimum of 10% absolute disparity which has been adopted in other circuits, but he found that the 10% rule was not dispositive because the Sixth Circuit has not adopted it, and he suggested that the rule may be inapposite because it was derived from *Swain*, which was decided before *Duren*. That is a reasonable conclusion, especially in light of the Supreme Court's declination of the respondent's invitation to adopt such an inflexible rule, finding no need in such cases "to take sides today on the method or methods by which underrepresentation is appropriately measured." *Smith*, 559 U.S. at 329-30 & n.4.

Considering the comparative disparity figures cited by Rothman (42%) and Stephenson (73.1%), the magistrate judge found that the latter figure would suffice under some recent holdings, but the former would not, citing *United States v. Weaver*, 267 F.3d 231 (3d Cir. 2001) (comparative disparities of 40.01% and 72.98% insufficient, where absolute disparities were 1.23% and 0.71% respectively); *United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000) (finding that comparative disparities of 40.89% and 58.39% were insufficient, but noting another holding that a

-24-

68.22% comparative disparity was sufficient); *United States v. Clifford*, 640 F.2d 150 (8th Cir. 1981) (46% comparative disparity insufficient).

After reviewing those authorities, the magistrate judge concluded that the evidence was sufficient to support a finding of underrepresentation under *Duren*, because it "presents a more obvious example of exclusion 'inherent in the particular jury-selection process utilized' than that in *Smith*." Rep. & Rec. [dkt. #50] at 22. The magistrate judge concluded that because the computer error "understated the county population by 3.8 times," and because of the unique circumstance that the input file listed names in zip code order, where the lower zip codes represented suburban areas with much smaller proportions of African-American residents, it was apparent that the computer selection routine inherently and systematically excluded African-Americans from the panels that were selected.

That conclusion follows logically from the evidence. There is evidence that exclusion of the African-American population from Kent County juries lasted for several months and became noticeable to an ordinary observer. Wayne Bentley testified that during the summer of 2001, he noticed the absence of African-American jurors in jury venires and would rarely see a jury venire that contained three percent of African-American members. Other jury commissioners likewise commented on the lack of minority jurors in the pools continuing into 2002. Dr. Rothman's report captures the dip in the presence of African-American jurors in the Kent County jury pools from April 2001 through July 2002 in the following table:



Rothman Rep. at 7.  As demonstrated, Dr. Rothman noted "a sharp [decrease] from April 2001 through August 2002" in the number of African-Americans on jury venires, and a return to pre-computer-error percentages in August 2002 after the defect was corrected.

In concluding that the petitioner had established systematic underrepresentation under *Duren*, the magistrate judge relied principally on *United States v. Jackman*, 46 F.3d 1240 (2d Cir. 1995), in which significant underrepresentation resulted from a documented computer glitch that "caused the letter 'd' in 'Hartford' to communicate to the computer that all potential jurors from Hartford were deceased and thus unavailable for jury service."  Rep. & Rec. [dkt. #50] at 22.  In *Jackman* the Second Circuit specifically rejected the suggestion that it rely on an absolute disparity statistical comparison as being dispositive of the question under *Duren*, in part because the absolute percentages of Black and Hispanic voters residing in the districts in question were low (6.34% and 5.07% of the population, respectively).  The *Jackman* court also weighed heavily the fact that the

-26-

procedure used to select the challenged venire drew primarily from juror lists that had been constructed using a procedure that already had been found to be constitutionally flawed, with only a limited attempt to supplement the improperly constructed list using lists that did include Hartford residents. The court of appeals concluded that "[l]ike the prior total exclusion of Hartford and New Britain residents from the jury pool, the underrepresentation here 'was quite obviously due to the *system* by which juries were selected.'" *Jackman*, 46 F.3d 1240, 1248 (2d Cir. 1995) (quoting *Duren*, 439 U.S. at 367 (emphasis in original)).

Although the magistrate judge considered the statistical data in light of the decisions of other courts, it is clear that he weighed heavily the unusual circumstance in this case that the particular computer glitch, like the procedure used in *Jackman*, had the inherent and obvious effect of systematically excluding from the venire the residents of defined geographic areas known to have a significantly higher population of jury-eligible minority residents compared with the areas that were disproportionately favored in the selection process. As the Supreme Court explained in *Smith*, it has not prescribed a particular method by which underrepresentation must be evaluated, either in terms of specific statistical methods or otherwise. *Smith*, 559 U.S. at 329. On the particular and unusual facts of this case, it is reasonable and sensible to weigh the apparent mathematical effects of a selection process that was biased in an undisputed and deterministic fashion at least as heavily as the nominal statistical outcome of that process, when deciding whether the petitioner has shown that the underrepresentation of minority jurors in his venire "was systematic — that is, inherent in the particular jury-selection process utilized," and that "the representation of [jury-eligible minority residents] in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community." *Duren*, 439 U.S. at 364.

Statistical analysis may provide compelling evidence of systematic exclusion. But where, as here, the documented nature of the mechanical selection process itself facially demonstrates the precise means by which minority members of the community were systematically excluded from the venires produced, that also may provide compelling evidence that the resulting underrepresentation of minorities is not "fair and reasonable" under *Duren*. *See United States v. Ovalle*, 136 F.3d 1092, 1106 (6th Cir. 1998) ("The government suggests that there is no proof that any group is underrepresented in the ultimate jury wheel so as to create an equal protection violation. That is not the point. The problem is the removal of persons from the jury wheel solely on the basis of race."). The respondent cites cases from other circuits which have rejected statistical disparities of the size shown in this case as insufficient standing alone to establish a *prima facie* case of underrepresentation under *Duren*, but she does not attempt to address or distinguish the overarching principles of *Duren* and *Jackman*, on which the magistrate judge relied for his conclusion.

Third, the respondent argues that the magistrate judge misconstrued and disregarded the "precedentially binding" decision in *United States v. Buchanan*, 213 F.3d 302 (6th Cir. 2000). However, in her objection, the respondent persists in a disturbing and careless misreading of the facts of *Buchanan*, where she contends that

> [c]omparing the general population of African Americans to those who were generally qualified to serve demonstrates a 2.09% absolute disparity, subtracting 2.49% from 4.58%. This would yield a 45% comparative disparity (dividing the absolute disparity 2.09% by the total percentage 4.58% in the community).

Resp.'s Supp. Brief [dkt. #48] at 26. The respondent argues that because Dr. Rothman's analysis is "controlling," and because it revealed a comparative disparity less than the 45% that the

-28-

respondent alleges was shown in *Buchanan*, the evidence derived from Dr. Rothman's report is not sufficient to establish a significant disparity in this case.

However, as the petitioner points out in his response to the objections, the respondent in her briefing has misapplied the absolute disparity calculation by subtracting the percentage of African-Americans in the venire from those in the entire community. The correct method — and the one on which the Sixth Circuit based its holding in *Buchanan* — involves subtracting the percentage of African-Americans in the venire from the percentage in the community *who were eligible for jury service* — not the percentage in the population as a whole. The Sixth Circuit's explanation makes clear that it used the latter method:

> The testimony of the jury clerk established that African-Americans comprise 4.58% of the total population of the counties located within the Grand Rapids jury wheel. *Of those residents who qualify for jury service, 2.49% are African-American.* In the instant action, there were two African-Americans in a venire of seventy, constituting 2.86% of the venire, *which slightly exceeds the proportion of African-Americans in the Grand Rapids area qualified to serve as jurors.* These statistics indicate that there was no violation of the fair cross-section requirement in this case.

*Buchanan*, 213 F.3d at 310 (emphasis added). As the court of appeals noted, its finding of no statistical disparity was based on the fact that the percentage of jurors in the venire was *higher* than the percentage of eligible voters in the county. That result could only follow from the correct subtraction of 2.49% from 2.86% — not the incorrect subtraction of 2.86% from 4.58% on which the respondent relies in her briefing. Because the statistical evidence in *Buchanan* showed a percentage of minority voters in the venire that was higher than that in the jury-eligible population, its holding is inapposite to the situation here, where the statistical evidence under both of the offered analyses showed an underrepresenation in the venire.

-29-

The respondent's criticism of the magistrate judge's determination of the evidence at the hearing has no merit. That objection will be overruled.

### D.

The respondent also argues that the Supreme Court erred when it decided *Duren v. Missouri*, 439 U.S. 357 (1979), and *Taylor v. Louisiana*, 419 U.S. 522 (1975). Apparently, it is the official position of the state attorney general that the Sixth Amendment does not guarantee Michigan citizens the right to a jury selected from a fair cross-section of the community. The Supreme Court declined to adopt that view in *Smith*, and instead held that "[t]he Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Smith*, 559 U.S. at 319 (citing *Taylor*, 419 U.S. 522). The Court also declined to take up that argument again when it denied *certiorari* in *Ambrose*. *Booker v. Ambrose*, 133 S. Ct. 993 (2013) (order denying petition for *certiorari*). This Court finds no merit in the argument, and nonetheless is bound by Supreme Court precedent. That objection will be overruled.

### II.

One last point must be addressed. The Court referred the case to the magistrate judge to conduct a hearing to determine, among other things, the ethnic composition of the jury venire in the defendant's case. That direction was based in part on the Court's view expressed in *Parks v. Warren*, 773 F. Supp. 2d 715, 726-27 (E.D. Mich. 2011), that the systematic underrepresentation of minorities in the jury pool could be harmless if a particular venire by happenstance fairly represented the racial makeup of the community. The magistrate judge criticized that holding in

his report in this case, and rightly so. *See* Rep. & Rec. at 17 n.12. A fair reading of the authorities

on that point does not support the Court's decision in *Parks*.

The Sixth Circuit addressed that issue in *Ambrose*, stating:

A petitioner raising this claim is challenging the pool from which the jury is drawn, and not necessarily the venire panel directly before him. Accordingly, the composition of one panel does not indicate whether a fair cross-section claim exists.

The irrelevance of the composition of a single venire panel is underscored by the fact that a petitioner may bring a claim even if minorities are included in his panel. The Sixth Amendment guarantees only the opportunity for a representative jury, not a representative jury itself. The focus, therefore, is on the procedure for selecting juries, and not the outcome of that process. As the First Circuit eloquently put it:

[T]o hold that a litigant is not entitled to a representative jury when the jury venires are drawn from a fair cross-section of the community but that the cross-section requirement can be dispensed with when the dice fall a particular way in an individual case undermines the analytical foundation upon which the right to a jury drawn from a cross-section of the community is based.

*Barber v. Ponte*, 772 F.2d 982, 993 (1st Cir. 1985), *vacated on other grounds*, 772 F.2d 996 (1st Cir.1985) (en banc).

*Ambrose*, 684 F.3d at 645-46.

This Court, therefore, repudiates its holding in *Parks*, and concludes that the racial and ethnic

composition of the actual venire from which the petitioner's jury was drawn is irrelevant. The Court

finds that the petitioner has established a *prima facie* violation of the fair cross-section requirement

under the Sixth Amendment. The burden shifts to the State to show a "significant state interest [that

is] manifestly and primarily advanced by those aspects of the jury-selection systems, such as

exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Duren*, 439

U.S. at 367-68. The State makes no claim that any such interest exists in this case.

-31-

III.

The petitioner has established cause and prejudice sufficient to excuse his procedural default. Although the magistrate judge mistakenly held that prejudice could be presumed, the evidence shows that the petitioner has shown actual prejudice. Moreover, the record reflects that at the time he was tried, the petitioner's jury was selected from a pool assembled by using a method that systematically excluded African-American jurors from that pool, in violation of the Sixth Amendment. The Court therefore will grant the petition for a writ of habeas corpus.

Accordingly, it is **ORDERED** that the magistrate judge's report and recommendation [dkt. #50] is **ADOPTED IN PART**.

It is further **ORDERED** that the respondent's objections to the report and recommendation [dkt. #51] are **OVERRULED**.

It is further **ORDERED** that the petition for writ of habeas corpus is **CONDITIONALLY GRANTED**.

It is further **ORDERED** that the respondent shall release the petitioner from custody unless the State brings him to trial again within seventy days.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  October 9, 2013

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 9, 2013.

s/Shawntel Jackson
SHAWNTEL JACKSON